IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | **Criminal No. PWG-13-0251** |
| | * | |
| OTIS M. DRAYTON, JR., | * | |
| | * | |
| Defendant–Appellant. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Defendant appeals his conviction before Magistrate Judge Thomas M. DiGirolamo for driving under the influence of alcohol and drugs, on the grounds that his Confrontation Clause rights were violated when an expert witness who did not perform or observe any of the toxicology testing of Defendant's blood testified about the results of certain blood tests. Defendant argues that the expert acted as a conduit for inadmissible hearsay when he offered his opinion and interpretation of the data generated by other scientists who did not testify. Because the trial court found that the expert relied only on non-testimonial raw data generated by machines, I find that his testimony did not rely on hearsay and thus did not violate Defendant's rights under the Confrontation Clause, so the judgment below will be affirmed.

## I.    BACKGROUND

The underlying facts of this case are undisputed: Shortly after 10:00 p.m. on July 21, 2011, Defendant–Appellant Otis M. Drayton, Jr. was driving on the Baltimore–Washington Parkway ("the Parkway") when he was stopped by an off-duty Hyattsville City Police Officer for swerving and tapping on his brakes erratically.  Trial Tr. 110:11–25, December 19, 2011 (the "Tr."), ECF No. 3.  The Officer smelled an odor that he believed to be beer and observed signs

he believed were consistent with Drayton's impairment.  Tr. 112:14 – 113:7.  After coordinating with United States Park Police ("Park Police"), who have jurisdiction over the Parkway, Tr. 113:5–17, Drayton eventually was arrested and taken to Prince George's Hospital Center for an involuntary blood draw, Tr. 138:3–8.   A standard blood kit, consisting of two glass vials of blood in a sealed plastic box, was transferred by the Park Police to the toxicology laboratory of the D.C. Office of the Chief Medical Examiner (the "Laboratory"), Tr. 138:14 – 140:16.  The chain of custody was documented, Tr. 17:14–19, and photographs were taken of the blood kit to document the condition in which it arrived, Tr. 28:1–6.  The blood was tested for alcohol and drugs, revealing that it contained significant amounts of alcohol, Tr. 30:14–19, and phencyclidine ("PCP"), Tr. 34:12–21.

At trial, the Government called Mr. Lucas Zarwell, the Laboratory's Deputy Chief Toxicologist, as an expert in forensic toxicology to offer his opinion about Drayton's blood test results, pursuant to Fed. R. Evid. 702.  Defendant immediately objected to Zarwell's expected testimony, alleging that he was acting as a conduit for inadmissible testimony—the reports of non-testifying technicians who tested Drayton's blood—in violation of *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), and the Confrontation Clause.  Tr. 4:17–24.  Judge DiGirolamo stated that he would reserve ruling on this objection until the Supreme Court issued its soon-expected decision in *Williams v. Illinois*, 132 S. Ct. 2221 (2012), and allowed the examination of Zarwell to proceed, Tr. 6:3–21.

Zarwell testified from personal knowledge about the Laboratory's standard operating procedures (which he had created), the way that standardized controls and calibration are used to verify the accuracy of results generated, and the process for handling and preservation of samples through the chain of custody.  Tr. 15:5 – 20:4.  He also testified about the process

generally used when the Park Police submit a blood sample for testing, which typically involves subjecting the sample to screening by both enzyme immunoassay ("ELISA") testing and by gas chromatography.[1]  Tr. 20:5 – 23:15.  Finally, he described the process by which a supervising toxicologist typically performs a first review of the testing scientist's summary and of the raw batch data printed out by the testing instruments, *see* Tr. 59:7–12, before Zarwell, as Deputy Chief Toxicologist, receives every case file for secondary review of the same data and results, Tr. 24:14 – 26:13.

Zarwell also described the four initial laboratory tests that were performed on Drayton's blood sample (the "Sample") by two technicians: a preliminary alcohol screen by Kisha Fahle, Tr. 29:9 – 30:19; App. 163, a confirmatory alcohol screen by Kiran Chopra, Tr. 30:22 – 31:12; App. 165, a preliminary drugs of abuse screening by Chopra, Tr. 33:1–15; App. 169, and a PCP confirmation by Chopra, Tr. 33:19 – 34:7; App. 174.  The first three tests were reviewed by Scott Larson, a supervising toxicologist whose qualifications are similar to Zarwell's.  Tr. 24:6–17, 60:22 – 61:3; App. 163, 165, 169.  Zarwell reviewed the PCP confirmation and noted a failure of laboratory controls, so he ordered the test repeated; that repeat test was performed by Natalie Ludwig and reviewed by Larson.  Tr. 34:8 – 34:21; App. 179.  Zarwell himself did not handle or directly observe the Sample or testing or perform any of the tests on Drayton's blood.  Tr. 48:3–12, 63:19 – 72:14.

Zarwell testified that Drayton's blood contained .048 grams per 100 milliliters of alcohol, Tr. 30:14–19, and .01 milligrams per liter of PCP, Tr. 34:12–21.  He based his opinion on the

---

[1]     ELISA is a preliminary toxicology test that uses a plate coated with specific antibodies that react and change color when exposed to drugs of abuse.  Gas chromatography, a more specific analysis used to confirm a positive ELISA result, separates the compounds in a sample based on their chemical nature so they each can be detected, identified, and quantified separately in a mass spectrometer.  Tr. 22:11 – 23:15.

laboratory's "litigation packet,"[2] Tr. 33:1–8, a set of documents that Zarwell brought to trial that related to lab work on Drayton's blood.  The packet included, among other documents, the printouts of raw data produced by the laboratory machines used to analyze blood samples, and several summary sheets prepared by the testing scientists.  Tr. 25:4–12, 29:9 – 30:1.  Zarwell testified that, after reviewing the raw data, he also generally reviews "the first reviewer's notes."  Tr. 25:13 – 26:16.

During his testimony, Zarwell sought to refresh his recollection with respect to the tests performed on Drayton's blood, and it is not entirely clear from the record what documents he referred to.  Tr. 29:9 – 30:1.  Zarwell identified a document within the litigation packet as a "summary sheet," Tr. 29:13–15, on which he relied to refresh his memory of who actually tested the Sample and the results, Tr. 29:9 – 31:7, but he then testified that the raw data contained in a computer printout showed a blood alcohol level identical to the one on the summary sheet.  Tr. 31:8–12.  At this time, Defendant objected based on an understanding that Zarwell was reading from a report written by Kiran Chopra and signed by a reviewer, Tr. 31:13–16, later identified as Scott Larson, 60:22 – 61:3.  Judge DiGirolamo disagreed, and instead credited Zarwell's representation that "he [was] looking at the raw data that was generated."  Tr. 31:21–24.  Relying on the raw data, Zarwell testified that Drayton had a blood alcohol concentration of .04 g/100mL and a PCP concentration of .01 mg/L.  Tr. 32:15 – 34:21.

There also was a dispute over whether the litigation packet had been entered into evidence and on what terms.  Tr. 59:13 – 60:14.  In his Memorandum Opinion and Order, Judge DiGirolamo found that the litigation packet never was offered or accepted into evidence, and he

---

[2]      The litigation packet, despite being referenced and used at trial, is not an exhibit to the Court's electronic record.  However, because it has been submitted as part of the Appellate Appendix, it is appropriate for consideration, and its exclusion from the record on appeal is harmless.  *See infra* note 4.

therefore did not rely on its contents in his role as the fact finder.  Mem. Op. and Order 10 n.2,
ECF No. 2-7.

Judge DiGirolamo found that, although Zarwell "reviewed all of the raw data, including
the data regarding the test runs and the reliability of the controls[, and] reviewed the notes made
by the technicians in the testing process," *id.* at 10, "Zarwell based his opinion not on those
reports, but on the raw data generated during the testing process and the other information in the
file," *id.* at 11.[3]  Finally, following the *Williams* decision, Judge DiGirolamo held that Zarwell's
independent opinion based on raw data was not testimonial under Fourth Circuit precedent, and
that Drayton's right to confront the witnesses against him therefore was not violated by admitting
Zarwell's opinion without the testimony of the lab technicians who performed the testing.  *Id.* at
13–15.

Drayton was convicted of driving under the influence of alcohol or drugs at the
conclusion of his trial.  Trial Tr. 8:20–24, March 4, 2013, ECF No. 8.  He appeals this judgment
based on his objection at trial that the admission of Zarwell's testimony about the results of
laboratory tests violated the Confrontation Clause because Zarwell did not perform or witness
any tests of Drayton's blood but, instead, based his opinion on the reports of other technicians.
Appellant's Mem. in Supp. of Appeal 1, 7, ECF No. 10.  Drayton also disputes that Zarwell's
conclusion actually was independent and based on raw data, and argues that, even had Zarwell
reached an independent conclusion based on raw data, it would not cure a Confrontation Clause
violation arising out of the introduction of allegedly testimonial reports.  *Id.* at 13.

## II.    STANDARD OF REVIEW

Federal Rule of Criminal Procedure 58(g)(2)(B) permits a defendant convicted before a

---

[3]    Because no individual documents in the litigation packet were marked at trial, it is
unclear whether the reports are among the other information Zarwell purported to rely on.  They
do, however, appear to be part of the litigation packet.  App. 158–182.

magistrate judge to appeal his conviction to a district judge.  Rule 58(g)(2)(D) provides that the scope of an appeal from a magistrate judge's order or judgment "is the same as in an appeal to the court of appeals from a judgment entered by a district judge."  Therefore, I review the Magistrate Judge's findings of fact for clear error, meaning that, in consideration of all the evidence, the finding leaves me with "the definite and firm conviction that a mistake has been committed."  *United States v. Jackson*, 728 F.3d 367, 372 (4th Cir. 2013).  I review a magistrate judge's general evidentiary rulings for abuse of discretion, *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007), but review an evidentiary ruling implicating the Confrontation Clause de novo, *United States v. Summers*, 666 F.3d 192, 197 (4th Cir. 2011).

## III.   DISCUSSION

In addition to his Confrontation Clause challenge, Drayton has appealed several of Judge DiGirolamo's other rulings.  I address the factual issues first because Drayton's legal arguments rest heavily on the facts that he disputes. I then will turn to the mixed question of what was admitted into evidence and, finally, to Drayton's contention that Zarwell's testimony violated the Confrontation Clause.

### A.  Factual Disputes

Drayton argues that the Magistrate Judge erred in finding that Zarwell "came to an independent opinion [about Drayton's toxicology results] based on his review of the data regarding alcohol and drug concentration in [the analyzed] blood."  Mem. Op. 11.  A finding made regarding the nature of the materials consulted by Zarwell is a finding of fact and is reviewed for clear error.  *See Jackson*, 728 F.3d at 372.

Drayton correctly notes that Zarwell was far from clear about the basis for some of his testimony.  Although Zarwell testified from personal knowledge about the Laboratory's processes for handling and analyzing samples generally, he lacked personal knowledge about

6

how the Sample was handled in this case because he never handled or observed it.  He read the identifying number given to Drayton's Sample, but lacked personal knowledge about the manner in which the tests on Drayton's Sample actually were performed, who performed them, and the results they generated—things that he did not observe or participate in directly, but that he knew about or inferred through his understanding of Laboratory procedure.  Zarwell also testified that, in his experience as a supervisor and having seen many analysts make mistakes before, he could detect such mistakes and he did not identify any in this case.  Finally, he testified that, based upon his interpretation of the raw data, Drayton's blood contained .048 g/100 mL of alcohol and .01 mg/L of PCP.

Defendant argued that, rather than offering an independent opinion, Zarwell was "reading a number from a report prepared by another person, reviewed by another person," neither of whom were Zarwell.  Tr. 31:13 – 32:12.  On cross-examination, Zarwell admitted that his assertion that correct laboratory procedure was followed in this case was based on his knowledge of the Laboratory's quality control procedures, and not on any actual knowledge of how the Sample was handled.  Tr. 64:18 – 65:8.  At one point he testified that the opinion he offered in court was based on the raw data produced by the laboratory tests, and not the summary sheets that Defendant argues are testimonial.  Tr. 30:14 – 21.  He later testified that the information in the summary sheet was necessary to confirm the accuracy of the raw data and that, in his view, "[o]ne does not stand without the other," Tr. 61:12–20, before backtracking to the position that "[t]he [testing] method itself stands on its own because it's been validated," Tr. 66:23–24.

Conflicting and unclear testimony, however, is the essence of an adversarial trial, and it is within the province of the fact finder—the trial judge in a bench trial—to resolve conflicts in the testimony and  evaluate the credibility of each witness when making an ultimate determination as

to the facts. *See, e.g.*, *United States v. Moses*, 540 F.3d 263, 268–69 (4th Cir. 2008) ("We owe particular deference to the [trial] court's credibility findings, as the court is in a much better position to evaluate those matters."). This deference particularly is warranted here, where only those present at the trial can know what documents Zarwell was looking at during his testimony, and where the record does not contradict Judge DiGirolamo's observation and, in fact, appears to confirm it as follows:

> MS. LEGRAND: And just to be clear, this is subject to our continued — and to make it clear, you know, what Mr. Zarwell is reading from a report written by Kerin Chopra[] and signed by a second person, neither of whom is Mr. Zarwell.
> THE COURT: Okay.
> MS. LEGRAND: So again, he is reading a number from a report prepared by another person and signed off on by another person.
> THE COURT: Well, he has testified that he is looking at the raw data—
> MS. LEGRAND: But I —
> THE COURT: — that was generated.

Tr. 31:13–24.

To the extent that Drayton argues that Zarwell was not, in fact, reviewing the raw data, the record, at best, is unclear on the matter, and Judge DiGiroloamo's clarification therefore is conclusive. *See Greene v. Tucker*, 375 F. Supp 892, 898 (E.D. Va. 1974) ("While the transcript is ambiguous, in such circumstances a judge's understanding of what transpired in his court must be given substantial if not conclusive weight."). And to the extent that Zarwell was inconsistent about which documents he was reviewing, Judge DiGirolamo, sitting as the fact finder and evaluating the credibility of the witness, accepted Zarwell's statement that his opinion was based on the machine-generated data contained in the litigation packet. Because Judge DiGirolamo was deciding between two contradictory portions of Zarwell's testimony, it could not have been clearly erroneous to credit one portion over another.

## B. Evidentiary Rulings

Drayton contends that Zarwell improperly read the data contained in the litigation packet into the record.  Appellant's Reply 1, ECF No. 14.  This is a mixed question: whether the packet should have been admitted is an evidentiary ruling reviewed for abuse of discretion, and whether the packet actually was admitted is a question of fact reviewed for clear error.  *See Jackson*, 728 F.3d at 372; *Summers*, 666 F.3d at 197.  Nothing in the record reflects either abuse of discretion or clear error.

On cross-examination of Zarwell, Defendant referred repeatedly to the summary sheet from the litigation packet.  The record confirms that the litigation packet had been referenced, at the very least, for identification.  Tr. 29:9 – 30:1, 33:1–6, 73:24 – 75:3.  The Government indicated its belief that the documents had been admitted into evidence under Local Rules 107.5(b) and 211.  Defendant objected only to admission of the documents for their truth.

Judge DiGirolamo reserved ruling on the objection.  *See* Tr. 59:13 – 60:20.  In his Memorandum Opinion and Order, he clarified:

> [a]t trial, there was some discussion about whether or not the raw data to which Zarwell referred during his testimony was admitted into evidence pursuant to Local Rule 211. The Court did not review any of the raw data during the trial and did not formally admit it into evidence.

Mem. Op. 6 n.2.

Noting that none of the reports even had been offered into evidence at all, Judge DiGirolamo did not reach the question of whether the litigation packet was admissible.[4]  *See id.*

---

[4]     It is not entirely clear that the Court was correct that the lab reports never were offered into evidence, since the entire litigation packet appears to have been referenced repeatedly.  Loc. R. 107.5(b) (exhibits mentioned during the examination of a witness are offered into evidence absent an order of the Court to the contrary or a request by counsel that the exhibit be marked for identification only).  However, even if incorrect, it is harmless because the record is sufficient to support Judge DiGirolamo's eventual ruling that the documents were not admissible, Mem. Op.

at 10 n.3. The ruling sustaining Defendant's Loc. R. 107.5(b) objection and excluding the litigation packet was a standard evidentiary ruling applying the Local Rules and the Federal Rules of Evidence: the litigation packet was referenced, Defendant objected, and the court did not overrule the objection. Nothing in the record reflects any abuse of discretion. But a trial court is in the best position not just to evaluate what information may come into evidence, but also to track and recognize what evidence has been offered at all. Judge DiGirolamo determined that, although Zarwell relied on certain portions of the litigation packet under Fed. R. Evid. 702(c) and 703, the packet never was admitted into evidence. Mem. Op. 6 n.2. That determination was not clear error. Simply put, as a matter of evidence law, distinct from the Confrontation Clause challenge, there is no error associated with an expert expressing an opinion based on reliable information that itself is not admissible into evidence. Fed. R. Evid. 703.

### C. The Confrontation Clause

Finally, Drayton contends that Zarwell relied on the hearsay statements of non-testifying scientists in violation of Drayton's rights under the Confrontation Clause. U.S. Const. amend. VI; *see also Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011). But a machine cannot bear witness against an accused within the meaning of the Confrontation Clause. *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007). Although the most recent Supreme Court case on this topic, *Williams v. Illinois*, 132 S. Ct. 2221 (2012), clouds—rather than clarifies—the issue of what a particular forensic expert may rely upon in a criminal trial, it does not disturb the longstanding rule that only a human may be a declarant, or the holding in *United States v. Washington*. *Williams* and its predecessors, *Crawford v. Washington*, 541 U.S. 36 (2004),

---

6 n.2, which was within his sound discretion. *See* Loc. R. 107.5(b). Because the litigation packet was offered at trial but not admitted into evidence, I treat it as an exhibit marked for identification, but not admitted.

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming*, only addressed expert testimony relying on or authenticating reports or certificates prepared by a human declarant, not raw data generated by a machine.

In *United States v. Washington*, the Fourth Circuit held that "raw data generated by [] machines do not constitute 'statements,' and [that] machines are not 'declarants.'" 498 F.3d at 231. This is an unremarkable proposition given the requirement that a "statement"—the key to the hearsay rule—be made by a "person"—not an inanimate machine. Fed. R. Evid. 801(a) and (b). The *Washington* court confronted a nearly identical set of facts as in this case: a defendant's blood sample was tested for PCP by gas chromatography and the laboratory's chief toxicologist read the raw data printed out by the testing machine, interpreted the results at trial, and testified that the defendant's blood contained PCP. *Id.* at 228–29; *see also* Fed. R. Evid. 703 (expert opinion may be based on data the expert has been made aware of). Washington contended that the data printouts were hearsay statements of the lab technicians and that the toxicologist's reliance on the printouts without the technicians's testimony violated the Confrontation Clause. *Id.* at 227. The court rejected this argument, holding that even if the raw data could constitute statements, they were statements of the *machine,* not the technician, and therefore were not hearsay under Fed. R. Evid. 801(c) or testimonial within the meaning of the Confrontation Clause. *Washington*, 498 F.3d at 230, 232.

Drayton argues that *Washington* has been abrogated by two recent Supreme Court cases, *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), and *Williams v. Illinois*, 132 S. Ct. 2221 (2012). I disagree. In *Bullcoming*, the prosecution offered into evidence a certificate containing the results of a blood-alcohol analysis to support the defendant's conviction for driving under the influence. 131 S. Ct. at 2709–10. The certificate had been prepared by the analyst who had

tested the defendant's sample and contained a certification that the analyst was qualified to perform the testing and that all established procedures had been followed. *Id.* at 2710–11.

Because the analyst had been placed on unpaid leave at the time of trial and was not available to testify, the prosecutor offered the certificate into evidence as a record of regularly conducted activity, *see* Fed. R. Evid. 803(6), relying on the testimony of a different, uninvolved lab technician to authenticate it as custodian of records. *Bullcoming*, 131 S. Ct. at 2712. The custodian did not offer an independent opinion concerning the defendant's blood alcohol content, although he offered expert testimony as to the workings of gas chromatography machinery and the laboratory's established procedures. *Id.* at 2713. The trial court admitted the certificate and the New Mexico Supreme Court affirmed. *Id.* The United States Supreme Court reversed, holding that the admission of the analyst's certificate without his testimony violated the Confrontation Clause. *Id.* The Court found that the certificate clearly was testimonial because it had been prepared and certified in anticipation of trial, so it could not be introduced at trial unless its author was available for cross-examination. *Id.*

Drayton relies on a misreading of a hypothetical employed in *Bullcoming* to argue that *Washington* no longer is good law. In *Bullcoming*, the Court observed that, where a police officer records the readout of a radar gun in his police report, that record is a "statement" to which a subsequent officer could not testify in court without having observed the radar gun himself. *Bullcoming*, 131 S. Ct. at 2714–15. Drayton, however, ignores the crucial role played by the officer as an intermediary in recording an objective fact that the subsequent officer then testifies about. *Id*. The statement that the Supreme Court found violated the Confrontation Clause in this hypothetical was not the read-out of a radar gun; it was the police report containing the officer's observations, which unquestionably is a testimonial document. *Id.*; *see*

*Crawford*, 541 U.S. at 51. Testimony about the report's contents would have been hearsay within hearsay—that is, testimony about what the officer claimed to have observed in his report.  That hypothetical does not involve a witness's testimony about the results of a system or process shown to produce reliable results, under Fed. R. Evid. 901(b)(9), from a witness who saw the radar readout himself.  Because *Washington* dealt with an expert analyzing raw data generated by a machine, and not a report created by another person, it remains valid after *Bullcoming*. Further, the Fourth Circuit expressly has recognized the continuing validity of *Washington* after *Bullcoming* in *United States v. Summers*, 666 F.3d 192, 202 (4th Cir. 2011), and *United States v. Hall*, 497 F. App'x 299 (4th Cir. 2012).

Drayton also argues that *Washington* was invalidated by *Williams v. Illinois*, 132 S. Ct. 2221 (2012).  In *Williams*, prosecutors introduced the expert testimony of a specialist from the Illinois State Police Lab who testified to similarities between a known DNA profile from a law enforcement database and one returned from Cellmark, an outside laboratory that had been retained to analyze swabs in a rape kit.  *Id.* at 2227, 2229 (plurality opinion).  Cellmark had generated a report containing a DNA profile of a suspect and returned it to the Illinois lab, but no one from Cellmark testified at trial.  *Id.*  At trial, the expert was asked whether the Cellmark DNA profile created from the rape kit matched the DNA profile of the defendant in the law enforcement database.  *Id* at 2229–30.

The defense objected to the characterization of the Cellmark profile as originating from the rape kit, arguing that, because the expert lacked personal knowledge of the provenance of the Cellmark report, her testimony that the Cellmark DNA profile actually was from the rape kit swabs violated the Confrontation Clause.  *Id.* at 2230.  The prosecutor clarified that the question was not about the source, quality, or authenticity of the Cellmark sample, but merely about the

expert's opinion of whether the two profiles matched. *Id.*[5] The trial court overruled the objection, and the expert testified that the two DNA profiles matched. *Id.* On cross-examination, the expert testified that it was unlikely that the match resulted from degradation because a degraded sample would show specific, telltale patterns of degradation that she could identify from the face of the profile itself. *Id.* at 2231.

In a divided decision with no majority opinion, the Supreme Court affirmed the ruling below, holding that the expert's testimony was admissible. *Id.* at 2228. Writing for a four-Justice plurality, Justice Alito concluded that the testimony was admissible on two independent grounds: that the testimony about the source of the Cellmark profile was not offered to prove the truth of the matter it asserted, and that the Cellmark report and profile were not testimonial because they were not created for the purpose of obtaining evidence to be used against the defendant. *Id.* The plurality recognized that the expert's opinion, that the DNA profiles matched, would have lacked probative value had the government not "offered conventional chain-of-custody evidence" and "other evidence to establish the provenance of the profiles," but considered that an entirely separate matter from the expert's comparison of the two profiles. *Id.* Accordingly, the plurality concluded that admitting the statement that the samples matched did not violate the Confrontation Clause. *Id.* at 2244.

Justice Thomas concurred in the judgment, but on separate grounds. *Id.* at 2255 (Thomas, J., concurring in the judgment). According to Justice Thomas, the Cellmark report was not testimonial because it lacked "formality and solemnity," which he considered hallmarks of the out-of-court testimonial statements the Confrontation Clause forbids. Under Justice Thomas's reasoning, because it lacked these hallmarks, the introduction of the Cellmark report

---

[5]   Because *Williams* was a bench trial, the judge, as finder of fact, disregarded the expert's statement about the source of the Cellmark report. *Williams*, 132 S. Ct. at 2236–37.

simply could not violate the Confrontation Clause. *Id.* at 2260. But Justice Thomas, joined by the four dissenters, rejected the plurality's view that the profile had not been relied upon for its truth, *id.* at 2257, as well as the plurality's use of a primary purpose test to determine whether the Cellmark report was testimonial, *id.* at 2261. Justice Thomas opined that "a primary purpose inquiry divorced from solemnity is unworkable in practice," and that the plurality's formulation of the test "lack[ed] any grounding in constitutional text, in history, or in logic." *Id.* at 2262.

Given that Justice Thomas, the key fifth vote in the judgment, found little common ground with the plurality, it is unclear what precedential value *Williams* might have, if any, in a case that does not involve an identical or nearly identical set of facts. *Compare Derr v. State*, 73 A.3d 254, 269–70 (Md. 2013) (finding a limited portion of Justice Thomas's opinion controlling), *with Jenkins v. United States*, 75 A.3d 174, 176 (D.C. 2013) (finding no agreement between the opinions concurring in the judgment, and thus no rule of law to apply). But however convoluted the *Williams* case may be, the Cellmark report was the statement of a scientist (or, more likely, several scientists), and was not just a mechanical printout from a machine, *Williams*, 132 S. Ct. at 2227–28 (plurality opinion), so *Williams* can be distinguished from *Washington*. Despite that distinction, Drayton argues that, because Justice Thomas concurred with the four dissenting Justices that underlying information an expert references necessarily is offered for its truth, *id.* at 2257 (Thomas, J., concurring), the conclusion of these five Justices carries the force of law. But that is not how Supreme Court split decisions apply: in fractured cases such as *Williams*, "the holding of the Court may be viewed as that position taken by those Members *who concurred in the judgments* on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (emphasis added). Five Justices who share a dissenting viewpoint limit the holding of the Court to the narrower views supported by a majority, but they

do not create their own holding cobbled together from non-precedential rationales. *See id.*

Finally, Drayton argues that the Fourth Circuit itself abandoned the holding of *Washington* and declared raw data to be statements in *United States v. Shanton*, 513 F. App'x 265 (4th Cir. 2013) (per curiam).  In *Shanton*, in which the Supreme Court granted certiorari and summarily vacated and remanded for further consideration in light of *Williams*, 131 S. Ct. 181 (2012), the Fourth Circuit reiterated that a DNA expert could offer an opinion about raw data without the testimony of the technicians who performed the laboratory testing, *Shanton*, 513 F. App'x at 267.  It did so under the view that

> if [*Shanton*] were to go before the Supreme Court again, . . . five justices would affirm: Justice Thomas on the ground that the statements at issue were not testimonial and Justice Alito, along with the three justices who joined his plurality opinion, on the ground that the statements were not admitted for the truth of the matter asserted.

*Id.*; *see also* Appellant's Reply 2 (quoting same but emphasizing "statements").  With respect to the language used in the opinion, I do not believe that this unpublished, per curiam decision, containing exactly two paragraphs applying *Williams* to the facts of *Shanton*, was intended to effect the abrogation of *Summers*, 666 F.3d at 202, applying *Washington*.  *See Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1995) (en banc) ("Under [the Fourth Circuit's] internal rules, unpublished opinions are not prescential . . . .").  Moreover, the Fourth Circuit was explicit that, "[a]fter *Williams*, *Summers* still has precedential value in this court."  *Shanton*, 513 F. App'x at 267.  Thus, the more reasonable reading is that the panel used the term "statements," albeit imprecisely, to align the *Shanton* case with the language used by the Justices in *Williams*.[6]

---

[6]   Moreover, as the Fourth Circuit "has consistently recognized, 'a panel of [that] court cannot over-rule, explicitly or implicitly, the precedent set by a prior panel of [that] court.  Only the Supreme Court or [the Fourth Circuit] sitting en banc can do that.'"  *United States v. Brooks*, 524 F.3d 549, 559 n.17 (4th Cir. 2008) (quoting *Scotts Co. v. United Indus. Corp*, 315 F.3d 264, 271–72 n.2 (4th. Cir. 2002)).  Given the fractured nature of *Williams*, its limited precedential

Drayton also ignores the result in *Shanton*, which *allowed* expert testimony based on machine-generated data despite the defendant's Confrontation Clause objection.  *See id.*

Further, *Williams* simply is not on point here.  Despite the view of the dissenting Justices that the testifying expert relied on the truth of the Cellmark report, there was no dispute in *Williams* that the report was prepared by a person or persons, and consequently that it was an out-of-court statement.  *Williams*, 132 S. Ct. at 2228 (plurality opinion); *id.* at 2255 (Thomas, J., concurring).  Zarwell relied on raw data generated by an accurate system or process, as is permitted by Fed. R. Evid. 703 and 901(b)(9), and by *Washington*, 498 F.3d at 228.  *Williams* did not consider machine-generated data at all, and therefore did not touch the holding of *Washington*, which controls this case.

Finally, Drayton argues that Zarwell's independent conclusion would not cure a Confrontation Clause violation like the one in *Bullcoming*.  But because Zarwell was evaluating machine-generated data and not the statement of a declarant, his testimony did not violate the Confrontation Clause in the first place.  Unlike the expert in *Bullcoming,* Zarwell did not attempt to authenticate or introduce into evidence reports containing the statements of other scientists.  *See Bullcoming*, 131 S. Ct. at 2712, 2715 nn.7–8; *see also Melendez-Diaz*, 557 U.S. at 329 (certificate created and sworn by a non-testifying laboratory analyst was inadmissible); *Crawford*, 541 U.S. at 70 (tape-recorded statement given to the police by a non-testifying witness was inadmissible).  Rather, Zarwell, testifying as a qualified expert, was presented with machine-generated toxicology data and gave his opinion interpreting that data.  *See* Fed. R. Evid. 703 and advisory committee's note (opinion of expert may be based on "presentation of data to

---

value, and most critically, the fact that it seems to approve of the admissibility of the evidence in *Washington* and *Summers*, the Supreme Court cannot be said to have overruled those cases.

the expert outside of court and other than by his own perception"). The trial court did not admit the testing reports or the raw data into evidence; the only toxicology evidence in the record was Zarwell's opinion. While admission of the reports might have implicated the Confrontation Clause under *Bullcoming*,[7] Zarwell's independent evaluation of the raw data does not.

Zarwell, who offered his own conclusions about machine-generated raw data, was available for cross-examination, and Drayton took advantage of this opportunity. Drayton was able to explore Zarwell's lack of knowledge about the circumstances surrounding the actual testing, the possibility and effect of any errors during testing, and the chance that any malfeasance might have occurred. All of these issues, however, go to the *weight* a fact finder should give to Zarwell's opinion of the raw data he was provided: Zarwell could testify to what the data showed, but could not vouch for its accuracy. *See Melendez-Diaz*, 557 U.S. at 311 n.1 (recognizing the prosecution's discretion as to how to demonstrate chain of custody, authenticity, and accurate testing of a sample, because these concerns go to the weight of the evidence, not its admissibility); *see also* Fed. R. Evid. 901(a); *United States v. Jones*, 356 F.3d 529, 535 (4th Cir. 2004) (recognizing that admissibility only requires chain of custody evidence sufficient "to convince the court that it is improbable that the original item had been exchanged with another or otherwise tampered with"). Accordingly, the Magistrate Judge's holding that Drayton's Confrontation Clause right was not violated was not erroneous.

---

[7]  Justice Sotomayor, a key vote in the 5-4 *Bullcoming* decision, also wrote separately to emphasize that *Bullcoming* was "not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited connection to the scientific test at issue. . . . We need not address what degree of involvement is sufficient because here [the testifying expert] had no involvement whatsoever in the relevant test and report." *Bullcoming*, 131 S.Ct. at 2722 (Sotomayor, J., concurring). Recognizing that Zarwell unquestionably is a supervisor and reviewer, I need not address this issue because the litigation packet is not in evidence.

### D.  Unpreserved Evidentiary Issues

Drayton's primary and continuing objection, relying on *Bullcoming*, was that the Confrontation Clause prohibited Zarwell from acting as a conduit for the data generated by the testing.  However, the mere fact that Zarwell's testimony did not violate the Confrontation Clause does not mean it was without any evidentiary shortcomings.

Evidence only is relevant if it helps prove or disprove a fact that is of consequence to the case.  Fed. R. Evid. 401.  Given that intoxication is an element of driving under the influence, whether a defendant has alcohol or drugs in his blood certainly is relevant, but whether a particular printout of toxicology data shows alcohol or drugs in a blood sample only is relevant if that data relates to the defendant.  *See* Fed. R. Evid. 104(b); 901(a) advisory committee's note ("Authentication and identification represent a special aspect of relevancy.").  The source of a blood sample is not information that requires an "expert's scientific, technical, or other specialized knowledge" to understand, *see* Fed. R. Evid 702, so it is not something on which an expert may opine; if witness testimony connects a defendant to data generated from a sample, that witness must have personal knowledge of the source of the data.  *See* Fed. R. Evid. 602.

Although Zarwell was qualified to interpret the testing data, he was not competent to testify to the source of that data.  *See Williams*, 132 S. Ct. at 2238–39 (plurality opinion) (recognizing that the testifying expert's opinion would be irrelevant had the state not authenticated the source of the suspect's sample with conventional chain-of-custody evidence).  Though the data was machine-generated, it is undisputed that someone else operated the machine outside of Zarwell's presence and that Zarwell had never handled or observed Drayton's Sample.  Yet Zarwell testified that the data was generated by tests on Drayton's blood.  Defendant objected multiple times that Zarwell did not have personal knowledge about the tests that were performed, and Zarwell confirmed this.  Tr. 5:25 – 6:2, 27:6–21.  However, those objections

were characterized as arising under *Bullcoming*, Tr. 6:10–17, 31:13 – 32:12, and appeared to relate to the analysis of data by an expert who did not produce it.  Because Zarwell simply was interpreting raw data generated by machine, his lack of personal knowledge of the tests was not material to his expert opinion.  In contrast, the identification of the blood sample was not within the ken of an expert and could not have been the subject of Zarwell's opinion.  Fed. R. Evid. 702.  Rather, this was fact testimony that must rest on personal knowledge.  Fed. R. Evid. 602.

It is not clear from the record that the Government showed that Zarwell had the requisite knowledge to tie Drayton to the Sample, but Drayton's exclusive reliance on his Confrontation Clause objection under *Bullcoming* renders that issue moot.  Drayton never raised a more general hearsay or relevance objection as required to preserve them by the Federal Rules of Evidence.  Fed. R. Evid. 103(a)(1)(B); *see* Tr. 5:25 – 6:20, 27:8–21, 29:1–7, 31:13 – 32:13, 77:5–11.  Some of these objections, were they properly developed on the record, may have had merit, and in the future the Government would be wise to provide a witness with personal knowledge of the provenance of materials on which an expert relies (and, it merits stating, do a better job of ensuring a clear record about whether documentary evidence is marked as an exhibit and properly admitted into evidence during the trial).  But Defendant's failure to preserve these objections at trial or to raise them on appeal operates as a waiver of these relevance issues, as distinct from the Confrontation Clause issue.  *See* Fed. R. Evid. 103(a); *see also Hill*, 471 F. App'x at 153–54 (rejecting a new exclusion argument on appeal despite the exception in Rule 103(a)(1)(B) for apparentness in context, because defendant had raised different grounds for objection at trial); *United States v. Dukes*, 242 F. App'x 37, 47 (4th Cir. 2007) ("It is well-established that a specific objection made on one ground will not preserve appellate review of a different ground.").

## IV.    CONCLUSION

For the  reasons stated, the judgment of the Magistrate Judge is AFFIRMED.  A separate order will follow.


Dated:  <u>June 26, 2014</u>                                   <u>              /s/            </u>
                                                                    Paul W. Grimm
                                                                    United States District Judge


pag